[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is a termination of parental rights proceeding filed by the Department of Children and Families (DCF) with respect to Natashia D. (d.o.b. 2/23/94) and Emage D. (d.o.b. 2/10/95). The CT Page 6758 children's mother, Gail M., and Allan D., were named as respondents in this action. (The biological parents were never married to each other.)
Per the applicable subsections of C.G.S. § 17a-112 (b), the petitioner originally alleged two statutory grounds for termination against each parent: parental failure to rehabilitate and acts of commission or omission. However, on December 2, 1996, the petitioner withdrew its allegations as to acts of commission/omission and thereafter proceeded only on the failure to rehabilitate counts. Pursuant to the provisions of C.G.S. § 17a-112 (d)(1) and C.G.S. § 17a-112 (d)(2), DCF has alleged, with respect to each respondent, that the grounds for termination have existed for less than one year, but that it is in the best interests of the children that this "one year" requirement be waived.
PROCEDURAL CONTEXT
Trial in this matter commenced on December 2, 1996 and continued on various dates thereafter until it concluded on May 19, 1997. Gail M. was present in court on each day of the trial and was represented by counsel. Allan D. was also present in court on each day of the trial, represented by counsel and assisted by his court-appointed guardian ad litem. DCF and the minor child were also represented by their respective counsel throughout the proceeding.
The petitioner introduced a total of 19 documents as full exhibits into evidence, as well as the testimony of the following witnesses:
1. Kevin Real, DCF social worker;
2. Tina P., foster mother;
3. Diane Barry, visiting nurse;
4. Richard Sadler, M.D., psychiatrist;
5. Dr. Nancy Randall, clinical psychologist;
6. Lisa DeMatteis, Program Director, Connections Inc.;
7. Bruce Freedman, Ph.D, psychological evaluator; CT Page 6759
8. Mark Adams, DCF social worker;
9. Karen Mack, Crossroads;
10. Donyale Pina, DCF social worker;
11. Kerry Gross, DCF supervisor;
12. Brownen Shepherd, DCF worker.
The respondent father offered four full exhibits into evidence. The following witnesses testified on his behalf:
 1. John Washenko, Community Mental Health therapist and licensed clinical social worker;
2. Lesley Lohr, Children and Families Agency;
3. Gloria Sotomayor, Children and Families Agency;
4. Lucas Daniels, DCF social services aid;
5. Donyale Pina, DCF social worker;
6. Allan D., respondent father;
7. Raymond Rigat, Esq., guardian ad litem;
8. Fernando Stern, M.D.
The respondent mother introduced one full exhibit and offered the testimony of the following witnesses:
1. Mark Lipman, Adult Probation Officer;
 2. Raymond Porzio, M.D., staff psychiatrist, Lawrence Memorial Hospital;
 3. Kathleen Gilbride, R.N., psychiatric nurse, Lawrence Memorial Hospital;
4. Glenda Johnson Woods, Crossroads;
5. Donyale Pina, DCF social worker. CT Page 6760
The counsel for the minor child participated fully in the trial, but did not offer any testimony or evidence.
FINDINGS OF FACT
Having carefully considered all of the evidence and testimony which was introduced during this lengthy trial, the court makes the following factual findings:
Both respondents have had long-standing and severe mental health problems which have interfered with their respective capacities to function as parents for a number of years. Allan D. suffers with the dual diagnosis of schizo affective disorder (bipolar type) and substance abuse. (Petitioner's Exhibit 20.) When he drinks intoxicants there is a risk that he will fail to take his psychotropic medication and decompensate mentally. Gail M. is a chronic alcoholic with an extensive history of relapses and failure in treatment programs.
The couple has been together for approximately seven years. Gail M. has given birth to 10 children, the last five of whom were fathered by Allan D. With the exception of Nicholas, an infant son who resides with the mother in a residential treatment facility', none of these children are in the care of either parent.
Natashia was born on February 23, 1994 and went into state custody two days later after DCF received an ex parte order of temporary custody from the court. Emage was born nearly a year later, on February 10, 1995. She followed her sister into the petitioner's care on February 15, 1995 pursuant to another OTC. Since February 25, 1995, the two children have resided together in the Norwich, Conn. foster home of Tina P. Natashia was committed to DCF as an uncared for child on April 21, 1995. Emage was committed to the petitioner on June 20, 1995.[2]
In March 1994, several weeks after Natashia's removal from the parental home, DCF prepared a written treatment plan spelling out what each parent would have to accomplish in order to achieve reunification with Natashia. It was expected that Allan D. and Gail M. would receive substance abuse treatment, visit Natashia, take parenting courses and sign releases which would enable DCF to monitor their compliance with treatment (Testimony of Kevin Real). An unsigned, written "stipulation" which was dated March CT Page 6761 14, 1994 and filed with the court indicated that the respondents were also required to refrain from the use of alcohol and illegal drugs and avoid further involvement with the criminal justice system. (Petitioner's Exhibit 14). On February 24, 1995, shortly after Emage's birth, the parties and counsel signed another stipulation which was also filed in court. (Petitioner's Exhibit 13). In part, this stipulation provided that Gail M. would enter into a long-term, residential substance abuse in-patient treatment program which had a psychiatric component and allowed her access to her children, and that she would refrain from alcohol and drug abuse. The document indicated that Allan D. would be required "to continue with substance abuse and psychiatric treatment" and not engage in alcohol and substance abuse. It also required that both parents "will provide full releases for all service providers to communicate with DCF and each other." (Petitioner's Exhibit 13). DCF workers Kerry Gross and Kevin Real provided credible testimony during this TPR proceeding that they informed both respondents that they would have to receive substance abuse and mental health treatment, improve their parenting skills and address domestic violence issues as part of the reunification process. The court finds from its review of the forgoing, and other evidence, that the petitioner consistently indicated to Gail M. and Allan D. the rehabilitative steps they would need to accomplish in order to regain their children.
Because Gail M. refused to visit Natashia in the foster home, DCF arranged supervised visits at the Smith-Bent Visitation Center and in the biological mother's home. From August 1994 until February 1995, the mother's visits were consistent. Allen D.'s visits with Natashia were suspended for several months in 1994 after the petitioner learned that the father had slapped one of his other children during a visit. DCF suspended all contacts between Allen D. and Natashia until it could confer with the father's mental health therapist. Allen D. refused to sign a release at first, but relented and did so in November 1994. His contacts with Natashia were reinstated in December 1994. Emage was born in February 1995.
According to DCF social worker Kevin Real, Gail M. and Allan D. each missed three visits with their children between March 1995 and June 1995. For approximately two months during the summer of 1995, the respondents completely discontinued their contacts with Natashia and Emage and dropped out of the agency's sight. The parents' whereabouts were unknown to the petitioner CT Page 6762 until August 7, 1995 when Mr. Real received the father's address from a Visiting Nurse Association (VNA) nurse who administered medications to Allen D. The social worker visited the home on September 25, 1995 and the parents resumed visitation at the Smith-Bent Center in October 1995.
Despite the removal of the children — and the reunification requirement that they abstain from the abuse of alcohol — both parents used or abused intoxicants on various occasions during the period from February 23, 1994 until the TPR petitions were filed on January 29, 1996. Kevin Real testified that he spoke with the mother — who was then pregnant with Emage — about her need for substance abuse treatment on various occasions between August 1994 and December 1994. He also testified that while he was the worker on this case, there were 10-12 times when he believed that the mother had either consumed alcohol, or was under its influence.
On December 7, 1994, Gail M. sounded intoxicated when she spoke to Mr. Real during a telephone conversation. This prompted the worker to conduct a home visit. He met with Gail M. at her residence and she appeared to be intoxicated. Mr. Real also noticed a bruise on the respondent's chin, and suspected that there had been a domestic dispute between the parents.
During a telephone conversation with Kevin Real on March 15, 1995, the mother again sounded to be under the influence of intoxicants. When the worker asked if she had been drinking, the respondent hung up the telephone.
On April 17, 1995, the New London Police Department arrested Gail M. on a charge of operating a motor vehicle while under the influence of liquor or drugs, failure to obey a stop sign and failure to carry an insurance card (Petitioner's Exhibit 18). The police report indicates that there "was a heavy smell of alcohol on her breath and her speech was slurred." Gail M. told police that "she had just one beer at her house. . ." (Petitioner's Exhibit 18). During a telephone conversation with Gail M. around that time, Kevin Real noted that the respondent slurred her words, jumped from topic to topic, and was unable to complete a thought. Gail M. admitted to the worker during that conversation that she had recently been arrested on the DUI charge referred to above. When Mr. Real visited the mother on May 2, 1995, the respondent appeared to be intoxicated. Gail M. denied using alcohol that day, but told the worker that she had been drinking recently. CT Page 6763
Mr. Real had a telephone conversation with Allan D. on May 10, 1995. The social worker concluded that the father was under the influence of alcohol, an allegation which the father has denied. Shortly afterwards, Mr. Real received a phone call from Gail M. The social worker testified that the mother was "completely incoherent" and that he was totally unable to understand her speech. The mother also sounded as if she were intoxicated during a June 5, 1995 telephone conversation with Mr. Real. When the worker inquired if she was drinking, the respondent once again slammed down the telephone.
In June 1995, Mr. Real went to the parents' residence after they both failed to appear at the juvenile matters court in Montville for a hearing concerning Emage. When he arrived there, the social worker observed both of the respondents on a porch drinking alcoholic beverages. During the encounter, Allan D. threatened Mr. Real with assault. Gail M. stepped in front of the father. According to the social worker, both respondents had the smell of alcoholic beverages on their person.
On August 8, 1995, Mr. Real again spoke on the telephone with Gail M. He testified that the mother slurred her words and sounded intoxicated. During a subsequent conversation with the worker on September 25, 1995, Gail M. admitted that she had been drinking when she spoke to Mr. Real on August 8th.
During his testimony at this trial, Allan D. denied that Mr. Real's accounts about the parents' drinking were accurate. However, Diane Barry, a visiting nurse who administered the father's haldol injections, provided testimony which corroborated that given by Mr. Real. She testified that she went to Allan D.'s residence on April 5, 1995 but that the father was not at home. When she returned the next day, both Gail M. and Allan D. were present, and both appeared to be intoxicated. Because of the father's condition, Ms. Barry was unable to administer the scheduled haldol shot. During that home visit, the visiting nurse observed Gail M. threaten Allan D. She also saw Allan D. grab Gail M. by the throat and push her into a chair. Ms. Barry testified that before she left, she urged the father to vacate the premises before the situation escalated. On May 3, 1995, Ms. Barry telephoned the residence to speak with Allan D. Gail M. answered the telephone and refused to allow the nurse to speak with the father. She testified that she was unable to administer the haldol injection scheduled for that date. CT Page 6764
In early August 1995, the nurse went to the parents' residence to administer haldol to Allan D. She discovered that both respondents had moved and was unable to locate where they had relocated. As a result, Ms. Barry was unable to administer the injection on that date. Allen D.'s whereabouts remained unknown to the VNA until the father called the agency on August 7, 1995 and provided his new address. Ms. Barry gave Allan D. his haldol shot that day. During the contact, the father admitted to Ms. Barry that he had been drinking recently.
Following these incidents, the VNA required that Allan D. report to its office to receive his shots. Ms. Barry testified that she thereafter administered the injections to the father through 1996 without incident.
Alan D. received substance abuse treatment from Steven Dorfman, a therapist at the Care Plus partial hospitalization drug/alcohol program in New London. This program is operated by the Elmcrest Hospital in Portland, Conn. Mr. Dorfman wrote to DCF social worker Real on May 16, 1995. He noted in that letter:
 "[Allan D.] is presently at the Care Plus Partial Hospital Program after being referred to me because of ongoing substance abuse and resistance to treatment goals. On April 25, 1995 he admitted to drinking five times a week up to six drinks a day. He refused to sign an agreement to live in a substance free environment because he stated that would mean leaving his girlfriend. He also refused to attend the recommended 5 AA/NA meetings a week and secure a sponsor. He was advised to go into inpatient treatment and then partial hospital before possibly returning to individual counseling with me and group counseling with Terri Keyes." (Petitioner's Exhibit 3).
Mr. Dorfman discontinued treatment with Allan D. as a result of the non-compliance referred to in the forgoing letter. An Elmcrest discharge summary noted that the respondent was in the Care Plus program from May 5, 1995 until June 8, 1995, and that "[the] patient's response to treatment was poor." (Petitioner's Exhibit 20, Page 2). The discharge summary also stated:
 "The patient while at the PHP was noncompliant with his treatment plan. He was relapsing and did not follow-up with AA meetings and was recommended CT Page 6765 to go to SCADD for detox. The patient has been discharged without maximum hospital benefit." (Petitioner's Exhibit 20, Page 4).
Mr. Real urged the father to obtain long-term, in-patient substance abuse treatment. The worker testified during this trial that he believed Allen D. posed a risk to the children whenever the father was drinking or unmedicated. To date, although Allen D. has obtained other treatment which will be discussed below, he has never received in-patient hospitalization for his alcohol problem.
Gail M. received out-patient substance abuse therapy at the Women's Center in New London, a treatment facility operated by the Women's Services of Groton agency, from 1993 until February 1995. DCF social worker Kevin Real testified that the Women's Center informed DCF that the mother had been compliant with treatment there, but did not disclose the fact that the mother had experienced relapses while in that program. In early 1995, Gail M. was referred to the Connections Program, a residential drug/alcohol treatment facility which Women's Services operates in Middletown. She was released from that facility after 10 days of treatment on February 23, 1995. The Connections staff did not believe they could meet the mother's needs, and believed that she should be in a more secure, long-term setting which had a psychiatric treatment component. The Connections staff recommended that the mother enter a residential treatment facility known as Crossroads in New Haven. Gail M. agreed to enter there in February 1995, but her admission was delayed for a time because she refused to sign necessary releases.
The mother was admitted at Crossroads on June 26, 1995. At that time, Mr. Real informed Gail M. that DCF wanted her to remain in residential treatment there for a period of — one year. The social worker told the respondent that he would initiate termination proceedings if she left the facility without satisfactorily completing treatment there. Despite this admonishment, Gail M. left Crossroads on July 4, 1995. The Crossroads discharge summary noted that the mother sought treatment "due to a 9 year addiction to cocaine and 22 year history of alcohol abuse. . ." (Petitioner's Exhibit 19, Page 1). It noted that Gail M. entered the program "expressing her desire to complete treatment but later became ambivalent, leading to the decision to leave [the] program." (Petitioner's Exhibit 19, Page 2). Crossroads personnel unsuccessfully attempted to discourage CT Page 6766 Gail M. from leaving the program, and encouraged her to reapply for admission there in 30 days. (Petitioner's Exhibit 19, Pages2-3). Karen Mack, a therapist at Crossroads, testified that the mother decided to leave the program because of a requirement that the respondent assign a large percent of her governmental assistance check to the program to help with the cost of her care. She testified that Gail M. was unwilling to make this assignment because it would cause her to lose her apartment. There was no evidence at trial that Gail M. ever discussed this problem with DCF, or undertook any other steps to remediate the situation without withdrawing from treatment. Following her departure from Crossroads in July 1995, the mother refused drug/alcohol treatment through the Care Plus Program. (Petitioner's Exhibit 15, Page 7). There was evidence at trial that Gail M. received substance abuse treatment at the Stonington Institute during the summer of 1995. (Respondent Mother's Exhibit 1). The court did not receive extensive information about this course of treatment, nor the respondent mother's participation therein. Per Mr. Real, Gail M. has denied her need for psychiatric treatment, minimized her abuse of alcohol, and denied that there were issues of domestic violence in her relationship with Allan D.
John Washenko, a therapist and licensed social worker with Community Mental Health Services of Eastern Connecticut, testified on behalf of Allan D. at trial. He stated that he has been treating the father in a weekly dual diagnosis therapy group since October 1995. According to Mr. Washenko, Allan D. has had "excellent attendance" at group meetings. Based on his observations of the father, he believes that Allan D. has remained substance free since then. The therapist also testified that he has not observed the father exhibit any symptoms of a psychotic process.
Fernando Stern, a psychiatrist, has treated Allan D. for chronic schizophrenic disorder since September 1995. He testified during this trial that he sees the father once every three weeks to monitor the respondent's medications. He does not conduct the father's psychotherapy. He indicated that Allan D. has an excellent record of attendance at these medical appointments. Dr. Stern testified that Allan D. has made good progress in treatment, has been stable for one year, and has maintained his sobriety. Dr. Stern based the latter conclusion on the fact that Allan D. stops taking his psychotropic medications when he is drinking, and decompensates mentally as a result. Since the CT Page 6767 father has not exhibited psychotic symptoms since becoming a patient in 1995, Dr. Stern concludes that Allan D. has not been actively drinking. Dr. Stern testified that there is no indication that Allan D. posed a danger to his children in his present mental state. He stated that if the father continues with his therapy, takes his prescribed medications and remains sober, his prognosis is above average. However, Dr. Stern also testified that a relapse by Gail M. could prompt a relapse by Allan D., if the couple continued to live together. Allan D. indicated his unwillingness to separate from Gail M. to Mr. Dorfman, and testified during this trial that he intends to continue his relationship with the mother in the future.
Gail M. was enrolled in a partial hospitalization program conducted by Lawrence and Memorial Hospital in New London from November 16, 1995 until early December, 1996. (She left this program to enter in-patient treatment at Crossroads in New Haven, where she was residing at the time of this trial.) Kathleen Gilbride, a registered nurse and the mother's primary therapist there testified at trial, and a report which she prepared was introduced into evidence. (Respondent Mother's Exhibit 1). That report indicates that although the mother was initially "guarded and defensively hostile," she eventually developed trust with group members and staff and became more open. (Respondent Mother's Exhibit 1, Page 1). Although Ms. Gilbride's testimony and report reflect progress by the mother, they also made reference to several problems.
Gail M. had a .04 blood alcohol level on February 9, 1996. On February 10, 1996 she went to the Lawrence and Memorial Hospital Emergency Room complaining that she had been unable to sleep, felt depressed and agitated and was hearing voices which were tormenting her about her past. (Respondent Mother's Exhibit 1). Ms. Gilbride's treatment report about that incident notes:
 "She was given Ativan 2 mg., Haldol 10 mg. IM, and Benadryl 25 mg. orally. The patient was sufficiently recompensated by the following morning to be discharged home. When seen at PHP on 2/14, she felt in control, denied symptoms of depression and denied hearing voices. No medications were prescribed.
 On those occasions when the patient appeared depressed, there were clear precipitants. When the patient adjusted to the situation or the situation was resolved, the patient CT Page 6768 was free of depressive feelings." (Respondent Mother's Exhibit 1, Page 1).
Gail M. had 12 unexcused absences at Lawrence and Memorial, a number which Ms. Gilbride termed "a bit excessive". The nurse also noted in her written treatment report:
 "On 10/25/96 the patient phoned to say she had no transportation for that day. She did not make contact with me again until 11/18/96 (at this time the patient was scheduled at PHP one day per week.) Repeated phone calls to her home were unanswered. She stated that she had been absent because of pregnancy symptoms. During this period she stopped attending Oasis, missed appointments with her couples therapist, and missed her OB appointment. She denied drinking.
 "The patient and her boyfriend were in the process of trying to regain custody of their two youngest children and she was aware that this behavior could jeopardize this effort. She was unable to process why she would take this risk.
 "In August, 1996 the patient started the process for admission to Crossroads — a residential program where she could keep her baby and have maximum support in maintaining sobriety. She was admitted there on 12/4/96." (Respondent Mother's Exhibit 1, Page 2).
The evidence at trial established that neither parent has completed the parenting and domestic violence classes recommended by DCF. There were also repeated instances during the period between February 1994 and January 1996 when Gail M. and Allan D. failed to cooperate with their agreement to provide DCF with releases so that the agency could monitor their cooperation with rehabilitative treatments and services.
ADJUDICATION — (based on facts as of January 29, 1996)
 1. Failure to rehabilitate: C.G.S. § 17a-112 (b)(2) sets forth the criteria for this non-consensual ground for termination of parental rights. The statute applies in those cases where the court finds by clear and convincing evidence that:
 "the parents of a child who has been found by the superior court to have been neglected or uncared for have failed to CT Page 6769 achieve such degree of personal rehabilitation as would encourage the belief within a reasonable time, considering the age and needs of the child, that they could assume a responsible position in the life of the child."
In its determination of whether or not parental failure to rehabilitate has occurred, the court must "analyze the respondent's rehabilitative status as it relates to the needs of the particular child." In re Felicia D., 35 Conn. App. 490, 500,646 A.2d 862 (1994). The court must also decide whether or not the parent can achieve the required level of rehabilitation "within a reasonable time." In re Luis C., 210 Conn. 157, 167,554 A.2d 772 (1989).
The court finds that Natashia was adjudicated as a neglected child by the Superior Court for Juvenile Matters in Montville on April 21, 1995. Emage was adjudicated a neglected and uncared for child by the same court on June 20, 1995. By the date of her adjudication, Natashia had already been in DCF custody for nearly 14 months. Emage, who was born on February 10, 1995, had been in the petitioner's care for approximately four months prior to adjudication. The DCF treatment plans and the stipulations which were signed in March 1994, shortly after the OTC was issued on Natashia, put both parents on notice as to the rehabilitative efforts each would have to undertake.
Clear and convincing evidence at trial established that during the period of time prior to January 29, 1996, Gail M. consumed and abused alcohol, and consistently minimized her substance abuse problems. She did so despite knowledge of the devastating impact which her substance abuse has had upon her children. Unfortunately the chronic nature of Gail M.'s alcoholism has rendered her unable to care for Natashia and Emage since they were born. After being informed by the Connections program staff in February 1995 that she needed intensive in-patient therapy, Gail M. delayed entering the Crossroads program for four months. During the interim, in April 1995, the mother was arrested for DUI. Gail M. entered the Crossroads program in late June 1995, but left in July, after only several days of treatment. She did so despite the assessment of DCF and clinicians that she needed to stay in that program for one year, and despite the admonition of social worker Real that he would seek terminations if the mother left Crossroads against medical advice. CT Page 6770
Allan D. also abused substances during the period in question. Although Allan D. testified at trial that he has been substance free since the fall of 1995, that statement constituted an admission that he continued to abuse alcohol for nearly 18 months after Natashia went into state foster care, and for approximately six months after the OTC concerning Emage was granted. He was discharged from the Care Plus program due to unsatisfactory participation in June 1995, and has subsequently disregarded suggestions that he obtain long-term in-patient hospitalization for substance abuse. Allan D. was uncooperative on several occasions in 1995 with the VNA nurse who administered his haldol injections.
Both parents failed to cooperate with DCF during the period in question. They avoided the agency for several months in the summer of 1995 and, despite their stipulation that they would do so, failed to provide releases on several occasions to the petitioners. The evidence at trial also proved that both respondents have a suspicion and distrust of DCF which makes it extremely unlikely that either parent would cooperate with the agency in the future.
Based on all of the forgoing, the court finds that the petitioner has proven by clear and convincing evidence that Gail M. and Allan D. both failed to achieve such degree of parental rehabilitation prior to January 29, 1996 as would encourage the belief, within a reasonable time, considering the ages and needs of Natashia and Emage, that they could assume a responsible position in the life of either child.
This court is aware that less than one year transpired between the date each child was adjudicated, and the date when the TPR petitions were filed in this matter. However, pursuant to the provisions of C.G.S. § 17a-112 (d)(1), the court finds by clear and convincing evidence from the totality of the circumstances surrounding each child that it is in the best interests of each child, with respect to each respondent, that the statutory time period mandated by C.G.S. § 17a-112 (c)(3) be waived.[3] The long-standing and chronic nature of each respondent's substance abuse and mental health problems, the extensive opportunities which each parent had over many months prior to the TPR filing to remediate those deficiencies, the length of time that both subject children, and particularly Natashia, were in state foster care prior to commitment, and the ages and needs of Natashia and Emage all lead the court to this CT Page 6771 finding.
In making each of the forgoing adjudicatory findings, the court has considered, but is unpersuaded, by evidence introduced at trial by both respondents concerning their rehabilitative efforts before and after the TPR petitions were filed in January, 1996. The respondents argue that this evidence establishes that they have rehabilitated and will be able to successfully reunify with Natashia and Emage within a reasonable period of time in the future. There was evidence at trial that both parents have made some personal progress in addressing their mental health and substance abuse illnesses. According to the testimony of Dr. Stern and Mr. Washenko, Allan D. has been compliant in taking his medications and has not engaged in alcohol or drug abuse during the past 17 months. Both professionals state that they are unaware of any evidence that Allan D. has demonstrated psychotic thought processes since 1993. Allan D. has cooperated in treatment with both Dr. Stern and Mr. Washenko. Gail M. participated in the partial hospitalization program at Lawrence and Memorial Hospital until December 1996. Since that time, she has been a patient at the Crossroads Program, where she resides with her infant son Nicholas. Both parents report that they have attended AA and NA meetings on a regular basis. The father claims to have been substance free since the fall of 1995, and the mother claims to have stopped using alcohol and drugs in February 1996. However, there was credible evidence at trial that Gail M. had relapse incidents in which she used alcohol in February 1996, and in February 1997.
Although each respondent has made some progress, the court does not find that either parent has rehabilitated to the point that he or she will be able to resume a responsible position in the life of either child within a reasonable future time. Credible evidence at trial indicates that both respondents continue to lack insight about their past parenting deficiencies and the needs of their children, and both continue to minimize their substance abuse and psychological problems and the impact they have on Natashia and Emage. Gail M. has yet to overcome the substance abuse which has plagued her for 22 years. She will need more time, and more treatment, to do so. Allan D. has indicated his intention to remain with the mother. He is at risk of relapse — and decompensation — if he continues to reside with the mother and she experiences a relapse.
DISPOSITION
CT Page 6772
Having found that the ground alleged for termination was proven by clear and convincing proof with respect to each respondent, the court now addresses the issue of disposition. During this portion of the trial, the petitioner is required to establish by clear and convincing evidence that a termination of parental rights would be in each clear and convincing evidence that a termination of parental rights would be in each child's best interests.
Both respondents were evaluated in connection with this case on June 17, 1996 by Nancy Randall, a licensed psychologist. In her report to the court, Dr. Randall noted:
 "Substance abuse has been a significant problem for [Gail M.] for many years. Although she admits that her children have been removed from her care as early as 1981 because of alcohol-related incidents, she does not acknowledge an alcohol problem that early in her life. At the current time she has resolved her substance abuse issues and she reported good attendance at AA meetings. Even so, she appears to be in a similar situation as she has been in the past, with still no understanding of the seriousness of her problems. She should be considered to be at very high risk for future relapses.
 "Over a period of time, [Gail M.] has been unable to place the needs of her children above her own needs, particularly with regard to her substance abuse. Although she is currently reporting a period of several months sobriety, she has a long history of noncompliance with treatment, relapses after short periods of sobriety and a lack of responsibility for her own part in the loss of her children. Her current pattern is not particularly different than what she has demonstrated in the past, and it is very likely that her future will follow a similar path." (Petitioner's Exhibit 9, Page 10).
As evidence of Gail M.'s lack of insight about her problems, Dr. Randall reported a comment made by the mother during the 1996 psychological evaluation. Gail M. told the evaluator that because Natashia and Emage are now a little older, they would be able to "call 911" if she (the mother) relapsed. Based on that, the mother did not believe that the children would be at any risk if she continued to have alcohol problems in the future. (Petitioner's Exhibit 9, Page 13). Dr. Randall wrote in her CT Page 6773 report that: "[Gail demonstrates her inability to understand the need for these children to be raised in a stable home that is free from these problems of substance abuse." (Petitioner's Exhibit 9, Page 14).
Dr. Randall testified that if the mother could remain substance free for at least a year, she would need at least another full year beyond that point before she would be able to care for Natashia and Emage. Gail M. admitted to Crossroads personnel in February 1997 that she had relapsed and consumed alcohol.
The psychologist concluded that Allan D. demonstrated significant problems in his thinking, poor insight into his own psychological issues, and faulty reasoning. (Petitioner's Exhibit 9, Page 11). Dr. Randall noted in her 1996 report:
 "Overall, Mr. Daniels does not demonstrate an ability to place his children's needs above his own. His history suggests that his own dependency needs, his poor judgment, his suspiciousness towards others and his significant substance abuse problem have taken precedence in his life and have prevented him from being able to provide an adequate home for his children. It does not appear that these issues are substantially different now than they have been in the past, and therefore it could be expected that they will continue to interfere with his ability to provide a secure, positive home for these children." (Petitioner's Exhibit 9, Page 12).
Dr. Randall concluded her report with the following recommendation:
 "Given the length of time that these children have already been in foster care, and the unlikelihood of their parents' ability to care for them in the near future, it would be detrimental to these childrens' development and mental health to require them to remain in foster care for a longer period of time while attempting to establish a stronger parent/child relationship. It is not expected that these parents will be able to provide an adequate home for the children in the foreseeable future, and therefore it is not in the interest of these children to allow further time to pass before they are able to be placed in a permanent home. Such a plan would require the children to remain in limbo, and this could be expected to have a detrimental effect on their emotional development and attachment CT Page 6774 abilities. (Petitioner's Exhibit 9, Page 17).
The court finds Dr. Randall's testimony and report to be credible, and accepts her findings and opinions as fact.
Natashia is now more than three years old and Emage is now more than two. With the exception of the time they spent in the hospital after their births, both children have lived in state foster care for their entire lives. Both children reside together in the foster home of Tina P., where they have made positive adjustments. The social study submitted by the petitioner in this case notes that both children have formed close and trusting relationships with their foster parents. Natashia and Emage view the foster parents as their primary caretakers, and do not view their biological parents as significant caretakers. (Petitioner's Exhibit 16, Pages 18-20).
Gail M. has been involved with the child welfare system since 1, and her parental rights have been previously terminated with respect to six of her 10 children. (Petitioner's Exhibit 16, Page 24). The most recent termination occurred on June 20, 1995, when both respondent's parental rights were terminated with respect to Liara D. and Allan D. Jr., and when Emage was committed to DCF by Judge Patrick Clifford at Superior Court for Juvenile Matters in Montville. The removal of Natashia in 1994, the removal of Emage in 1995, and the court proceeding in June 1995 should have propelled both parents to make dramatic and immediate efforts to rehabilitate. Unfortunately, that did not occur. Although each parent has taken some positive steps toward rehabilitation during the intervening two years, the court concludes that those efforts were insufficient, and that neither respondent will be able to play a meaningful role in the life of either child within a reasonable future time. It would be totally adverse to the best interests of both children to delay permanency planning any further in order to allow the parents additional time to pursue reunification.
Before this court may enter judgment in this matter, it is required to make and consider the following factual findings:
1. Services offered: The court finds as proven by clear and convincing evidence that DCF and other agencies offered timely, appropriate and extensive reunification and rehabilitative services to both respondents. These included visitation, out-patient substance abuse treatment programs, residential CT Page 6775 substance abuse treatment programs, psychological treatment, the Visiting Nurse Association services and DCF case management services. (See Petitioner's Exhibit 16, Pages 23-24).
2. Reasonable efforts to reunite: The petitioner also established by clear and convincing proof during trial that it made reasonable efforts to reunite Natashia and Emage with both of their biological parents. Through written treatment programs, stipulations and the admonishments of its social workers, DCF informed both respondents what rehabilitative efforts they needed to pursue. Through the services referred to above, the petitioners were given the means by which they could accomplish reunification.
3. Court orders: No court orders were entered in this case. Stipulations agreed to by Gail M. and Allan D. were entered in court during 1994 and 1995. These documents, and various treatment plans, specified the rehabilitative efforts which the respondents were expected to make in order to achieve reunification.
4. Feelings and emotional ties with parents and caretakers:
Natashia and Emage know their biological parents, but do not regard them as significant caretakers. The children have resided together in the same foster home for more than two years and have made a positive adjustment there. They regard their foster parents as their significant caretakers.
5. Age of the children: Natashia is three years old. Her date of birth is February 23, 1994. Emage is two years old. Her date of birth is February 10, 1995.
6. Parental efforts to adjust circumstances, conduct andconditions: Based on the totality of all the evidence and testimony introduced at trial, the court finds that neither Gail M. nor Allan D. made sufficient efforts to adjust their circumstances, conduct or conditions in order to make it in the best interests of Natashia and Emage that they be returned to either parental home in the foreseeable future.
7. Impediments to maintaining a meaningful relationship: Both respondents were offered visitation and a wide range of therapeutic services. The court finds that no unreasonable action of any agency or individual, and no adverse economic circumstance of either parent, prevented either of the respondents from CT Page 6776 maintaining a meaningful relationship with the children.
JUDGMENT AND ORDERS
Having considered the seven factors enumerated above, and having found that a statutory ground for termination of parental rights was proven by clear and convincing evidence against each respondent, the court further finds based upon clear and convincing evidence that a termination would be in the best interests of each minor child. Accordingly, it is hereby ORDERED
that the parental rights of Gail M. and Allan D. with respect to the minor children, Natashia D. and Emage D. be, and hereby are, terminated. It is further ordered that the Commissioner of the Department of Children and Families be appointed statutory parent of Natashia D. and Emage D. for the purpose of securing an adoptive home, or other appropriate placement, for them. Said Commissioner shall file with the court, no later than 90 days following the date of this judgment, a written report of the progress made towards such permanent placement. If adoption has not been finalized by September 1, 1998, then said Commissioner is further ordered to file a Motion of Review of Plan for Terminated Child, which shall be heard by the court no later than December 1, 1998.
Dated at Middletown, Connecticut this 17th day of June, 1997.
BY THE COURT
DYER, J.